ROBERT WAGGENER - SBN: 118450
LAW OFFICE OF ROBERT WAGGENER
214 Duboce Avenue
San Francisco, California 94103
Phone:         (415) 431-4500
Fax:            (415) 255-8631
E-Mail:        rwlaw@mindspring.com

Attorney for Defendant DWIGHT GILCHRIST

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | No. CR06 0538 SI |
| Plaintiff, | **DEFENDANT DWIGHT GILCHRIST'S SENTENCING MEMORANDUM** |
| v. | Date:   May 11, 2009 |
| DWIGHT GILCHRIST, | Time:   11:00 a.m. |
| Defendant. | Ctrm:  10 (Honorable S. Illston) |
| _____ / | |

## INTRODUCTION

Forty-eight year old defendant Dwight Gilchrist appears before this court for sentencing following his open guilty plea to the eighteen counts in the Indictment. Mr. Gilchrist has no prior criminal record and his criminal conduct in the present case occurred eight years ago during the time period between 1998 to 2001. There are numerous factual and legal objections to the presentence report in this case which are set out herein, but most importantly, it is submitted that the recommended sentences of 27 and 30 months, by the United States Attorney and the United State Probation Office respectively, are far in excess of what is reasonable and appropriate under the circumstances of this case.

Defendant Gilchrist herein addresses the factual background of this case, the personal background of the defendant, the Presentence Report authored by Probation Officer Cheryl L. Simone (hereinafter, PSR), and the issue of the just and appropriate sentence for the defendant.

1   Pursuant to the provisions of U.S.S.G. § 3553(a), it is submitted that defendant Gilchrist should

2   be sentenced to a probationary sentence.  Under the circumstances, it is submitted that there is no

3   justification for sentencing Mr. Gilchrist to actual jail time and the court should consider

4   electronic monitoring and/or community confinement.

5                                                              **I.**

6                              **OFFENSE CONDUCT AND HISTORY OF CASE**

7          Mr. Gilchrist has submitted an extensive statement regarding his offense conduct.  The

8   Indictment and the offense conduct in this case are broken up into two distinct categories,

9   Schemes 1 and 2.  Scheme 1 concerns Counts 1 through 10 in the Indictment where Mr. Gilchrist

10  worked as a low level employee at Wells Fargo Bank in their Overdraft Collections Unit.  Within

11  that unit, Mr. Gilchrist worked under the name of Michael Colston and he was immediately

12  terminated in March 1998 once investigators discovered that he was involved in altering bank

13  account records to portray Dwight Gilchrist as an account holder on the relevant accounts

14  charged in Counts 1-10.  Mr. Gilchrist made ten separate withdrawals ranging from $750.00 to

15  $2,000 from bank accounts under other people's names where "Dwight Gilchrist" had been

16  added as an authorized account holder.

17         Scheme 2 concerns Counts 11 through 18 in the Indictment and involved Mr. Gilchrist's

18  activities between 1999 and 2001 setting up various bank accounts under his name and other

19  names, depositing a number of fraudulent checks into those various accounts, and then

20  withdrawing funds from the account before bank officials discovered the nature of the

21  fraudulently deposited checks.  Within one to three days of the checks being deposited, Mr.

22  Gilchrist made withdrawals from the accounts, receiving money credited from the fraudulent

23  deposits.  The specific withdrawals charged in the Indictment ranged from $5,000 to $9,500 and

24  were made between February 2000 and May 2001.

25         For reasons that are still not clear, the arrest and prosecution of Mr. Gilchrist for the

26  charged offenses did not occur until August 2006.  There was basically a five-year gap between

27  the last criminal deed charged in the Indictment and Mr. Gilchrist's arrest and prosecution.  In the

28  meantime, Mr. Gilchrist completely turned his life around.

As to Scheme 1, Mr. Gilchrist was confronted with his illegal activities by a Wells Fargo investigator on March 24, 1998. Mr. Gilchrist walked away from the job and never returned. A month later, on April 24, 1998, the Wells Fargo security department reported the fraudulent activity to the San Francisco Police Department and presented them with extensive documentation regarding the fraudulent activity. (The evidence presented to the San Francisco Police Department is essentially the same evidence that is the discovery supporting Counts 1-10 of the current federal prosecution, including detailed computer printouts, personnel and identification information regarding Michael Colston/Dwight Gilchrist, and account information.) The San Francisco Police Department never actively pursued the investigation, never contacted or interviewed Mr. Gilchrist, and basically sat on the case until February 2001, when the documentation indicates the District Attorney's Office formally reviewed the case and "declined to prosecute because of problems identifying the suspect". The case was closed and the materials submitted by Wells Fargo were returned to them in March 2001. Wells Fargo then contacted the FBI in June 2001 to investigate and potentially prosecute Dwight Gilchrist.

By the time the FBI was contacted in the summer of 2001, Mr. Gilchrist had engaged in Scheme 2 of the Indictment with fraudulent withdrawals occurring between February 2000 and May 2001. The Scheme 2 activities of Mr. Gilchrist were eventually reported to the FBI by Wells Fargo, supplementing the materials previously assembled as to Scheme 1. The discovery in this case makes clear that through 2001 and early 2002, the FBI was well aware of Mr. Gilchrist's use of alternative identities and the fraudulent transactions and activities implicit to Scheme 2 and Counts 11-18, both through information provided by Wells Fargo and independent investigation by the FBI and the DMV. Despite their wealth of incriminating information, the FBI did not contact Mr. Gilchrist or attempt to interview him. Mr. Gilchrist was not aware of the pending criminal investigation in the hands of the FBI, or the previous San Francisco Police Department investigation, until he was arrested in 2006.

Mr. Gilchrist brazenly initiated civil proceedings against Wells Fargo relating to his fraudulent activities relating to two of his bank accounts, accusing Wells Fargo of depriving him of funds to which he was entitled (approximately $18,000). The suit was filed in July 2001.

1   Indeed, Mr. Gilchrist was deposed in the civil proceedings in late 2001 and extensively lied

2   under oath as to his own personal background and fraudulent activities, including specific

3   misrepresentations as to the accounts that are the subject of Counts 11 and 12 of the Indictment.

4   Eventually, in June 2002, an arbitrator denied Mr. Gilchrist's claim in the civil suit and the

5   matter was not pursued any further.

6            The FBI still had its investigation open and conducted interviews of fraud victims, Wells

7   Fargo personnel, and other witnesses through 2002.  In January 2003, the FBI obtained a copy of

8   the videotaped deposition of Mr. Gilchrist in the civil suit and in the middle of the year,

9   investigated and verified the false identities of Mr. Gilchrist through DMV documents, including

10  a fingerprint examination of fraudulently obtained driver licenses going back from 1995 to 2001.

11  In September of 2003, the FBI obtained passport information for Mr. Gilchrist to corroborate the

12  identification used in the fraudulent activities connected to Scheme 2.  With this information in

13  hand, the FBI still did not pursue a prosecution and the case remained fallow until mid-2004.  In

14  the summer of 2004, the FBI again met with the investigator from Wells Fargo, surveilled Mr.

15  Gilchrist's residence, and obtained some information regarding a post office box used by Mr.

16  Gilchrist and then the investigation stalled once again.

17           Over the two-year period between the summer of 2004 and the summer of 2006 the FBI

18  apparently did not conduct any significant investigation regarding Mr. Gilchrist's criminal

19  activities.  The FBI then began pursuing the matter again in June 2006.  Wells Fargo

20  investigative personnel and Postal Service investigators were again interviewed, basically

21  rehashing the same information that had been in the investigation file for years, and on August 1,

22  2006, Mr. Gilchrist was indicted on the present charges.  Mr. Gilchrist was then arrested at his

23  home in Danville early on the morning of August 7, 2006.  Mr. Gilchrist had never left the Bay

24  Area, was gainfully and productively employed, and his arrest and transportation to court was his

25  first formal notice of the long pending criminal investigation.

26           Summing up the situation, the FBI and the United States Attorney's Office failed to

27  pursue their criminal case against Mr. Gilchrist for five years.  The San Francisco Police

28  Department had dropped their criminal investigation back in 2001, after sitting on it for almost

1   three years.  Having turned his life around in 2006, Mr. Gilchrist was faced with defending his

2   criminal conduct years earlier.  Mr. Gilchrist's predicament may not rise to the level of actual

3   prejudice to establish a constitutional due process violation, but there can be no doubt that he has

4   been handicapped by the passage of time prior to his formal charging.  Records are now not

5   available, his entire life has changed by his own determination, and it is submitted that there is an

6   inherent unfairness to the way this case has been handled and not diligently pursued.

7                                                                   **II.**

8                                                      **PRESENTENCE REPORT**

9           The final Presentence Report in this case was prepared by Probation Officer Cheryl L.

10   Simone on April 14, 2009.  For reasons explained in the cover letter for this memorandum,

11   timing and logistics were such that defense counsel's objections to the Proposed Presentence

12   Report could not be resolved before the issuance of the final report.  As a result, there are a larger

13   number of objections, clarifications, and editions than the usual sentencing situation.  Portions of

14   the final PSR to which there are objections or factual clarifications and/or require the attention of

15   the court are discussed below, and are identified by page and paragraph number.

16   **Page 3:6**

17           One point of clarification is that Dwight Gilchrist, working under the name of Michael

18   Colston, added his name as an authorized account holder in a dozen different accounts in the

19   same time frame as the unauthorized withdrawals were made, between March 18, 1998 and

20   March 23, 1998.  In other words, Mr. Gilchrist worked at Wells Fargo for five months without

21   incident and it was all criminal activity and operation of the involved scheme took place at the

22   very end of that employment within a very brief time span.

23   **Page 3-4:7**

24           It is undisputed that when a fraud investigator attempted to question Mr. Gilchrist about

25   the Colston transactions, Mr. Gilchrist left the job site and never returned.  Mr. Gilchrist was

26   never made aware that the "Colston" matter was referred to the San Francisco Police Department

27   for criminal investigation and he was never contacted or interviewed by police officials.

28

**Page 4:8**

There is no question that Mr. Gilchrist subsequently engaged in another fraudulent scheme in late 1999 that is the subject of Counts 11-18 of the Indictment.  The implication of this paragraph, however, is that he "devised" this scheme on his own and worked on his own in carrying out the scheme.  As discussed in the personal statement of Mr. Gilchrist and later in the memorandum, Mr. Gilchrist's co-participant in both schemes was long-time Wells Fargo Bank employee, Barbara Wilson.  Defendant does not dispute his criminal conduct and participation in the scheme, but it is important to put his participation in some perspective.

By 1999, Mr. Gilchrist obviously no longer worked for Wells Fargo Bank and it is submitted that as a practical matter, Scheme 2 could not have been carried out without help from inside Wells Fargo.  Multiple fraudulent checks for large amounts were repeatedly submitted through various bank accounts attributed to Mr. Gilchrist at various branches.  There was never a hold put on any of the checks, and funds were withdrawn based on the deposits two or three days later.  A layperson non-Wells Fargo employee simply could not have carried that kind of a scheme without some inside knowledge or manipulation of check "hold" procedures, and Mr. Gilchrist's explanation as to Barbara Wilson's involvement makes absolute sense.[1]

**Pages 4:10-11**

The loss figures are addressed in a separate section of this memorandum, but the significant fact is that the loss figures submitted by the Government were provided by means of a spreadsheet and defendant submits that there is insufficient backup documentation available to

---

[1]In this regard, counsel subpoenaed Wells Fargo Bank for records to substantiate the manipulation of accounts and hold procedures regarding the subject accounts in order to corroborate the "insider" involvement.  It took Wells Fargo Bank an extremely long to respond to the subpoena, but the bottom line is that computerized records as to the various accounts are no longer available or searchable due to the passage of time and updated computerization by the bank.  In their early investigation of Scheme 2, Wells Fargo investigators apparently researched potential  individual bank teller involvement but apparently never investigated a more global involvement.

Due to technological and record keeping changes, Wells Fargo was unable to comply with requests made on behalf of Mr. Gilchrist to produce specific computer information or prior account information relevant to the background of his offense conduct (particularly having to do with his shared responsibility with an individual by the name of Barbara Wilson) and backup or confirmatory documentation regarding loss calculation and accounting activities within the bank branches and managerial structure. The absence of records and/or inability to retrieve or produce records is further discussed herein.

1   justify the intended loss figure of $294,779.78 as the operative guideline calculation figure.

2   Defendant is not disputing that there was significant loss, but submits that the loss figures are

3   inflated and unreliable.

4   **Page 5:13**

5         This paragraph sets out the factual basis for the adjustment for obstruction of justice

6   recommended in Paragraph 24 of the PSR pursuant to U.S.S.G. § 3C1.1.  The guideline

7   assessment for obstruction of justice is discussed in a separate part of this memorandum, but the

8   important clarification as to the factual content of this paragraph is that the activities described

9   for Mr. Gilchrist were not made in the context of any criminal investigation.  As described

10  earlier, Mr. Gilchrist did not know of the existence of any criminal investigation until he was

11  arrested at his home in August 2006.  Mr. Gilchrist did submit fraud claim reports as to the

12  involved accounts involved in Counts 11 and 12 of the current Indictment, but this was not a

13  situation where Mr. Gilchrist was confronted by official "Wells Fargo Bank investigators", as is

14  set out in this particular paragraph of the PSR.  Mr. Gilchrist filed a lawsuit having to do with

15  these two accounts and that lawsuit proceeded in civil context until it was eventually dropped by

16  Mr. Gilchrist.  Mr. Gilchrist indeed made false statements within the context of that civil action,

17  but it was not a situation where he was confronted with his criminal liability by fraud

18  investigators, law enforcement investigators or court personnel.  Mr. Gilchrist's conduct was

19  certainly brazen and reprehensible under the circumstances, but the important fact is that the

20  lawsuit was dropped and Mr. Gilchrist completely turned his life around.  The overarching

21  concept of "obstruction" or somehow delaying the prosecution simply does not apply.  It took the

22  government five years after 2001 to even file the charges.

23  **Page 5:14**

24        Adjustment for Acceptance of Responsibility is discussed in a separate section herein.

25  **Pages 5-6:18-30**

26        The total offense level for Mr. Gilchrist is calculated by the probation officer to be 18 and

27  that calculation and its guideline components are discussed in a separate section herein.

28

**Page 7:36**

There is no question that Mr. Gilchrist used different social security numbers at the time he was committing the fraud charged in this case, but there is absolutely no foundation for the speculative statement within PSR that "the defendant is believed to have obtained the identifying data of private citizens during his employ at UCSF". The false identification and documentation obtained and utilized by Mr. Gilchrist were a product of his scheming with the aforementioned Barbara Wilson and there is no basis for the speculation of Mr. Gilchrist stealing personal information when he was legitimately employed at UCSF. The second sentence of the paragraph should be stricken.

**Page 8:40**

Mr. Gilchrist grew up and lived in Memphis, Tennessee, until the age of 19, not in Mississippi as is set out within the PSR. Memphis is where Mr. Gilchrist went to high school (*see*, ¶ 51) and where he joined the Navy.

**Page 8:41**

In addition to Mr. Gilchrist's noted involvement in his children's activities, he also coaches their soccer and flag football teams. Mr. Gilchrist also coaches a number of youth All-Star teams and participates in clinics for the various youth sports, often traveling throughout the state for events.

The PSR incorrectly states that Mr. Gilchrist is involved with the Omega Boys' Club. The organization that Mr. Gilchrist is associated with is the Omega Psi Phi Fraternity (a branch of which does have some involvement with the Omega Boys' Club). It is true that Mr. Gilchrist continues to be involved with numerous charitable organizations in the East Bay through the Omega Psi Phi Fraternity, one of which is the adopt-a-family program.

**Page 8:43**

Mr. Gilchrist did recently lose his employment as a result of downsizing at Eastman Kodak, but he is not receiving any unemployment benefits. It is a bit of a mystery that the probation officer was unable to verify the employment of Mrs. Gilchrist, because she works at the same desk she was working at when she was interviewed by the FBI after Mr. Gilchrist's

1    arrest in 2006.  The difficulty may be that the Bayer Corporation bought the Novartis

2    Corporation after 2006.  W-2 statements for Mr. Gilchrist's wife were submitted to the probation

3    officer with financial information for Mr. Gilchrist and the W-2 information is again submitted

4    here, along with a business card (attached hereto as Exhibit A).

5    **Page 8:44**

6         Mr. Gilchrist has "brands" on both upper arms which he got back in his military and

7    college days and were listed under "scars" on his probation department worksheet.

8    **Page 8:45**

9         Mr. Gilchrist was diagnosed with iritis  and treated at UC Berkeley in 1994 and has had a

10   chronic condition ever since.  Iritis is a painful eye condition and Mr. Gilchrist has had a over a

11   dozen acute instances over the last 15 years.  There is actually no known prescription or non-

12   prescription medication for iritis.

13   **Page 8:46**

14        Mr. Gilchrist's sleep apnea was actually diagnosed back in 2003 and Mr. Gilchrist has

15   used a CPAP machine every night since then.  Dr. Cohen in Walnut Creek is Mr. Gilchrist's

16   current treating doctor.

17   **Page 8:47**

18        Recent tests results for Hepatitis C for Mr. Gilchrist have been positive, rather than

19   negative as reported in the PSR.  Also, Mr. Gilchrist was also diagnosed with diabetes six

20   months ago.

21   **Page 9:51**

22        Mr. Gilchrist has actually attended and received credits from four other colleges beyond

23   the University of Southern California and UC Berkeley, including Christian Brothers College in

24   Tennessee, local junior colleges, Laney and The College of Alameda, and El Camino Junior

25   College in the Los Angeles area.

26   **Page 9:53**

27        Mr. Gilchrist was laid off by Eastman Kodak in February, 2009.  Mr. Gilchrist was

28   known to Eastman Kodak as D. Henry Gilchrist and not "Bruce Gilchrist" as noted in the PSR.

1  The W-2 for Mr. Gilchrist and his business card are attached hereto as Exhibit B to reflect that

2  fact.

3  **Page 10:55**

4  The probation officer was unable to retrieve employment information for Mr. Gilchrist

5  for Barclay's Global Investors (BGI), Valoure, Inc., and @Road and Jefferson Wells

6  International, because of problems with matching names or social security numbers.  Part of the

7  problem may have been that some of these companies hire our or exchange employees along the

8  lines of headhunters or employment agencies.  For example, when Mr. Gilchrist worked at

9  @Road, he was being paid by Jefferson Wells.  Attached as Exhibit C is a W-2 from Jefferson

10  Wells for Mr. Gilchrist, containing his true name and social security number.  Also included is a

11  copy of an e-mail and a time sheet showing that when Mr. Gilchrist was working at BGI, he was

12  getting paid by RemX IT Staffing.

13  **Page 10:58**

14  Counsel has not seen the military records referenced in this paragraph, but is aware that

15  Mr. Gilchrist served his country in the United States Navy from 1979 to 1984.  There was a brief

16  AWOL period towards the end of Mr. Gilchrist's military career, but there was never any pursuit

17  of a desertion issue.  Mr. Gilchrist originally received a dishonorable discharge in 1984 due to the

18  AWOL incident and getting in to an altercation with a fellow service member.  After later

19  review, the discharge was changed to a general discharge and in fact, Mr. Gilchrist was able to

20  attend USC based upon his GI benefits.  In reference to Mr. Gilchrist being arrested on December

21  29, 1994 (ten years after he got out of the Navy), that reference is not true and it is unknown how

22  that particular reference arose.

23  **Page 12, Note A**

24  As indicated earlier, Mr. Gilchrist is not receiving any unemployment benefits. The

25  financial statement given to the probation officer was prepared when  Mr. Gilchrist  was working

26  at Eastman Kodak.

27  \\\\

28  \\\\

**Page 15:88**

Defendant submits that there is a basis for departure by the Court as is discussed further herein.

**Page 15:90**

Defendant submits that this paragraph is unfairly critical of Mr. Gilchrist, particularly in light of the overall circumstances of this case. The fraud that Mr. Gilchrist engaged in took place between 1998 and 2001, now over eight years ago. Mr. Gilchrist turned his life around on his own and has made himself out to be a committed family man and father, active in his community. These facts do not "all point to a person who is highly scheming and manipulative" and that reference is unsubstantiated and should be stricken from the report. To the extent the reference that Mr. Gilchrist "acquired the identifying data of innocent victims in the context of his "jobs" is further reference to employment at UCSF (*see* ¶ 36), it is completely unsubstantiated.

### III.

### GUIDELINE COMPUTATION

The probation officer is recommending that a total offense level of 18 be calculated for the defendant. Defendant objects to this calculation and below addresses various components of the offense level calculation.

**A.      Amount of Loss (U.S.S.G. § 2F 1.1(b)(1)(I)**

The probation officer is suggesting an eight level increase based on a total intended loss of $294,779.78, the figure set out in the Government's spreadsheet. The loss figure is further discussed below (Section IV). It is submitted that the eight level increase is not appropriate.

**B.      Use of False Identification (U.S.S.G. § 2F 1.1(b)(5)(c)(i)**

The probation officer has calculated a two-level increase for using false identification to produce or obtain *other false identification* [emphasis added].

The twist with assessing the two-level increase for this particularly provision is that the actual language of U.S.S.G. § 2F 1.1(b)(5)(c)(i) is to "use any means of identification unlawfully to produce any other means of identification". "Means of identification" shall be for an actual

person other than the defendant, or for a person for whose conduct the defendant is accountable

for on the basis of relevant conduct.  *See*, U.S.S.G. § 2E 1.1, comment (n.15)(2000 version).  The

Indictment charges the defendant with opening bank accounts in his own name and three fictional

character aliases (Michael Colston, David Bangsberg, and Bruce Gilchrist).  The assessment of

the two-level increase under this section is based on activities not charged in the Indictment

relating to social security numbers of three actual individuals (Dominick DePhillipis, David

Brendan Luke, and Randall Stuart (Gee)).  A diver's license was obtained for Mr. Gilchrist under

the name of Dominick DePhillipis and there is no actual loss attributed under the name Dominick

DePhillipis.  The example given in the guideline use notes is obtaining an individual's name and

social security number and obtaining a bank loan in that individual's name.   *See*, U.S.S.G. § 2E

1.1, comment (n.16(A))(2000 version).  Under the circumstances of this case, defendant submits

that a two-level increase under this section is not warranted.

**C.**     **Obstruction of Justice (U.S.S.G. § 3C1.1)**

    The probation officer has recommended a two-level addition based on Mr. Gilchrist

allegedly obstructing or impeding or attempting to obstruct the administration of justice pursuant

to U.S.S.G. § 3C 1.1.

    The obstruction of justice assessment is based on the conduct described in PSR paragraph

13, discussed earlier and relating to the 2001 civil deposition of Mr.  Gilchrist.  This deposition

took place apparently four months after the case was reported to the FBI by Wells Fargo (without

the knowledge of Mr.  Gilchrist) and roughly five years before Mr.  Gilchrist was arrested.

*United Stated v. DeGeorge*, 380 F.3d, 1203, 1222-23 (9th Cir.  2004) to indicate that the temporal

element for the enhancement may be met because the "investigation" by the FBI had apparently

begun.  However, there is absolutely no proof of actual obstruction of the "investigation,

prosecution or sentencing of the instant offense" as a result of the civil deposition.

    The government relies on *United States v. Magana-Guerrero*, 80 F.3d 398, 401 (9th Cir.

1995) for the proposition that the false testimony in the deposition does not require actual

obstruction of justice. Defendant disagrees.  The *Magana-Guerrero* case concerned a defendant

who lied to a pretrial services officer regarding his prior convictions.  The court's analysis was

1   that conduct of lack of candor or truthfulness related to statements to the court, or relating to an

2   official investigation or judicial proceeding. *Magana-Guerrero, supra*, 80 F.3d at 401.  Here,

3   defendant's lies to a Wells Fargo attorney in the civil deposition in no way impeded the FBI's

4   investigation or the instant court proceedings.  Defendant submits that the appropriate analysis is

5   whether the conduct actually resulted in a hindrance to the investigation or to his prosecution.

6   *See, United States v. Solano-Godines*, 120 F.3d 957, 962-965 (9th Cir.  1997).  The conduct does

7   not necessarily have to be obstructive conduct to a law enforcement or presenting official, but the

8   focus should be on the effect of the obstructive conduct.  *See, United States v. Luca*, 183 F.3d

9   1018, 1022-1203 (9th Cir.  1999).  Under the present circumstances, the two-level increase is

10  inappropriate.

11  **D.    Acceptance of Responsibility (U.S.S.G. § 3E1.1)**

12          The Government does not support, and the probation officer does not recommend

13  additional one-level reduction pursuant to U.S.S.G. § 3E 1.1(b) (PSR §§ 14, 27).  It is submitted

14  that the defendant is deserving of that additional one level decrease.

15          The defendant entered his plea open to the court at the time of his pretrial conference in

16  the midst of both sides preparing for trial.  On the other hand, prior to the time of his plea,

17  through counsel, the defendant offered to provide complete information to the government

18  concerning his own involvement in the offense, as well as that of Barbara Wilson, the long-time

19  Wells Fargo bank employee (Ms.  Wilson retired from Wells Fargo in 2002).  The government

20  rejected Mr.  Gilchrist's offer.

21                                              **IV.**

22                                       **AMOUNT OF LOSS**

23  **A.    Overview as to Loss**

24          By way of a spreadsheet and various attachments,  the government is alleging an actual

25  loss in this case of $155,013.15 and an intended loss of $294,779.78.  The PSR adopts these loss

26  figures.  For guideline purposes, the significant threshold is $200,000.00 as to whether Mr.

27  Gilchrist is deserving of an eight-level increase in his calculated offense level.  The next

28  threshold level below that is $120,000.00, calling for a seven-level increase.  (U.S.S.G. § 2F1.1)

1    Several points as to calculation of loss are worth mentioning.  If an intended loss can be

2    reasonably determined, the intended loss figure can be used if it is greater than the actual loss

3    figure.  It is recognized that in a fraud case, the loss figure will often be the same as in a theft

4    case.  According to the guideline use notes, the loss does not have to be calculated with precision

5    and the court need only make a reasonable estimation of the loss, given the available information.

6    "The guidelines do not present a single universal method for loss calculation under [U.S.S.G]

7    §2B1.1 -- nor could they, given the fact-intensive and individualized nature of the inquiry."  *U.S.

8    v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  Courts are to take a realistic, economic approach to

9    determine what losses the defendant truly caused or intended to cause, rather than the use of

10   some approach which does not reflect the monetary loss."  *U.S. v. Crandall*, 575 F.3d 907, 912

11   (9th Cir. 2008) (quoting *United States v. Allison*, 86 F.3d 940, 943 (9th Cir. 1996)).  The

12   government bears the burden of proof on facts underlying a sentence enhancement (*See*, *United

13   States v.  Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005)) and the guidelines and case law make it

14   clear that if the court is unable to determine either actual loss or intended loss with sufficient

15   certainty, it can rely on the defendant's personal gain from the fraud as an alternate measure of

16   loss.  *United States v. Zolp, supra,* 479 F.3d at 719-721.

17   Before discussing the specifics of loss calculation, the issue can be narrowed.  The

18   calculation as to the amount of actual financial fraud specifically alleged in the Indictment is

19   $65,250.00.  The loss alleged in the Indictment as to Counts 1 through 10  is $13,100.00 and

20   there is no dispute as to that calculation.  The loss dispute is based on the actual and intended

21   loss assessments relating to Scheme 2, Counts 11-18.  The specific loss alleged in the Indictment

22   as to Counts 11-18 is $52,050.00, and the government's allegations as to intended loss as they

23   relate to these counts is over five times that figure ($265,000.00 +).

24   The factual assertions and documentation regarding Schemes 1 and 2 are very different

25   and distinguishable.  Once the Scheme 1 activities were uncovered in 1998, there was a thorough

26   acquisition of computerized records and documentation by Wells Fargo to support the

27   allegations.  All of this material was submitted to the San Francisco Police Department in 1998,

28   where it is basically got shelved and then was resubmitted to the FBI in 2001.  The

documentation as to Scheme 2 related to a completely different kind of fraud, and was nowhere near as thoroughly researched, particularly as to computerized records and backup documentation.  The records obtained clearly demonstrate the existence of the fraud itself and Mr. Gilchrist's involvement in the fraud.  Other computer records and printouts as to the fraud conducted and the specific accounts are now not available because of the passage of time and new and improved software and programs installed by Wells Fargo.

The pool of records as to both Schemes 1 and 2 is basically limited to what was gathered and assembled back in 1998 and 2001 and then eventually forwarded to the FBI.  The problem that arises as a result of the limited pool of available information is an inability of Mr. Gilchrist to specifically challenge the loss calculations as to Scheme 2.  (Separate, but related, is an inability to fully explore the issue of relative culpability of Mr. Gilchrist with respect to Wells Fargo employee Barbara Wilson, which is discussed further herein.)

The essential problem is that records are not available or producible to challenge or refute loss calculation allegations because, even by subpoena to Wells Fargo, the relevant records have been purged or are no longer available.  The actual loss calculation alleged by the government as to Scheme 2 is $141,913.15.  A portion of that loss calculation is specifically attributed to Counts 11 through 18 ($78,769.52), and then additional actual loss is alleged as to other relevant conduct involved in the Scheme ($63,145.63).  Below, is a chart as to the count, the amount alleged in the Indictment, and the actual loss figure contained in the government's loss spreadsheet:

\\\\
\\\\
\\\\
\\\\
\\\\
\\\\
\\\\
\\\\
\\\\

| COUNT | AMOUNT ALLEGED | ACTUAL LOSS |
| --- | --- | --- |
| | | (claimed by the Government) |
| 11 | $8,000.00 | $8,056.31 |
| 12 | $8,750.00 | $8,245.50 |
| 13 | $9,500.00 | $9,012.42 |
| 14 | $5,900.00 | $5,796.24 |
| 15 | $5,000.00 | $12,349.32 |
| 16 | $5,000.00 | $13,873.09 |
| 17 | $5,000.00 | $12,251.40 |
| 18 | $5,000.00 | $16,606.24 |
| **TOTALS:** | **$52,150.00** | **$78,769.52** |

The total intended loss figure is alleged by the government to be $155,013.15 (adding the amounts in Counts 1-10) and then the government alleges approximately an additional $140,000.00 as its intended loss figure ($294,779.78), adding up all allegedly fraudulent checks in all accounts associated with the defendant.

**B.**    **Actual Loss**

The actual loss calculation summary for Scheme 2 is contained on Bates 2259 (attached hereto as Exhibit D), summing up alleged actual losses as to the bank accounts in Counts 11-18 and then summing up alleged actual losses for seven additional bank accounts not charged in the Indictment.  The actual loss figures for each account consist of a loss figure for each account based on a bank statement for each account from Wells Fargo, which has a negative balance figure.  In other words, the loss calculation for each separate account is based on accounting by Wells Fargo and not the FBI.  Defendant submits that there are errors in Wells Fargo's calculations and that a number of the alleged loss figures as to particular accounts are incorrect and overstated.

The defense did not employ a forensic accountant to review all the accounting figures. The analysis process has been to examine all the backup documentation provided in the discovery process and then the limited number of supplemental documents which were obtained as a result of subpoenas to Wells Fargo.  Below, are summarized what are submitted to be

1  significant miscalculations as to loss regarding specific counts in the Indictment and/or a lack of

2  backup documentation to substantiate the loss.  As stated earlier, there is no question as to fraud

3  being committed as to the charged counts, but it is a matter of how the actual loss has been

4  calculated and whether it can be substantiated.  The basic issue as to many of the accounts is that

5  "good" money in the accounts has not been added into the equation and balanced out as to the

6  loss figure, or that there are instances of double counting or insufficient backup documentation.

7        Below, defendant has focused on actual loss assessments for various counts in the

8  Indictment to demonstrate problems with the assessment.  The United States Attorney submitted

9  an extensive letter to the probation officer in this case with an inch thick stack of Bates-stamped

10  documents culled from the discovery to substantiate the loss calculation for each count.

11  Particular counts are discussed below and defendant is submitting a group of Bates-stamped

12  documents as an attached exhibit to this memorandum to demonstrating the accounting problem

13  for particular counts.

14        **1.      Count 11 (WFB Account #6013-423496)  (Attached as Exhibit E)**

15        The assessed actual loss for the account if $8,056.31 as an overdraft (Bates 1120).

16  The problem is that the government's paperwork does not substantiate the loss and does not

17  account for good money in the account.  The discovery in the case contains fraudulent checks for

18  $8,100.00 and $8,500.00 (Bates 441-444), but the bank statement and computer records relating

19  to the account do not show a deposit of $8,100.00 to the account.  (Bates 399.)  There is a deposit

20  of $7,500.00 to the account on February 28, 2000, using Mr. Gilchrist's passport number (Bates

21  406), and that is the amount reflected on the bank statement, but there is no corresponding check

22  for that amount.  Wells Fargo has an internal document reflecting an alleged forged check for

23  $7,500.00 (WFB Bates 81), but again, there is no corresponding check.  (Note:  there is also no

24  deposit slip for February 28, 2000, with a cash back of $600.00.)  The actual loss figure is thus

25  submitted to be overstated by at least $7,500.00.

26        **2.      Count 13 (WFB Account #0117-927335)  (Attached as Exhibit F)**

27        The government alleges the actual loss to be $9,012.42 (Bates 834) and the

28  defendant submits that the figure is overstated by at least $4,931.00.  There is no doubt that there

is a cash withdrawal check for $4,931.00 (Bates 824) for this account and that an account

statement reflecting a check paid for that amount (Bates 810).  However, defendant submits that

cash amount was never delivered to the defendant.  Defendant submits that what happened was

that a cashier's check for $4,926.00, plus a $5.00 service fee was requested for the defendant on

November 21, 2000.  The cashier's check was never produced and a second cashier's check for

$4,926.00 (minus the service fee) was attempted to be processed, but that also did not work out.

Rather than get a cashier's check, the defendant then simply withdrew $5,000.00 in cash, which

was in fact a fraudulent transaction (Bates 828).  Documents produced by the bank substantiate

this sequence.  Bates 826 shows the $4,931.00 attempted transaction, followed 23 seconds later

by the $4,926.00 attempted transaction.  Two minutes later, the $5,000.00 actual cash withdrawal

was processed (Bates 823.)

      **3.**      **Count 14 (WFB Account #0592-768253)  (Attached as Exhibit G)**

        The alleged actual loss for this account is $5,796.24, based on a withdrawal date

of November 24, 2000.  For whatever reason, neither the government or Wells Fargo can produce

the monthly statement for this account between October 19, 2000 and November 11, 2000,

during which time the account went from a negative to a positive balance.  At one point, a Wells

Fargo undated document indicates there is "currently no loss"  (Bates 1125) and other documents

indicate the loss as $5,786.74 (Bates 1122, 752).

      **4.**      **Count 17 (WFB Account #2017-969429)  (Attached as Exhibit H)**

        The assessed actual loss for this account is $12,251.40, but this loss may be

overstated by $4,500.00, due to a failure to account for "good money" in the account.  A

fraudulent ATM deposit of $9,000.00 is attributed to this account on May 14, 2001, but the

documentation shows a copy of the same check for $4,500.00 and then another check for

$4,500.00 deposited into another account (0117-027078) (Bates 378, 383-384).  Wells Fargo

documents show that the latter check from Yee Chan was charged back to the 7078 account and

not the account charged in Count 17 (WFB Bates 1977-78).  There was no doubt a lot of

confusion among the various accounts, including that many of the accounts, charged and not

charged in the Indictment, were interrelated as checking and savings accounts under the name.

1   Defendant submits that these circumstances have resulted in double counting and unreliability in

2   the assessed totals.

3        **5.**       **Count 18 (WFB Account #0087-065835)**  **(Attached as Exhibit I)**

4             The actual loss attributed to this account is $16,606.24 per the government's

5   spreadsheet.  First of all, Wells Fargo documents indicate the loss is $14,892.04 (WFB Bates

6   1990).  Four fraudulent checks were deposited into this account (Bates 932-35) as described by

7   the government.  This particular account was in the name of Bruce Gilchrist, and there are other

8   account not charged in the Indictment but assessed as part of the actual loss in this case that are

9   also in the name of Bruce Gilchrist (WFB #'s 5540-8226905, 5540-775714, and 2002-755452).

10  The government spreadsheet has an independent non-Indictment assessment for the 6905 account

11  of $19,942.35 and the alleged losses of account 5714 have been transferred to the account

12  involved in Count 18, per the government's spreadsheet (Exhibit D).  Documents produced by

13  Wells Fargo indicate charge backs to each of the accounts for amounts common to subject

14  fraudulent deposits and checks, and the accounting is utterly confusing and unintelligible without

15  the ability to have access to all of the relevant account date, now unavailable due to the passage

16  of time (WFB Bates 2037-39; Bates 999-1000).

17       To summarize, an accurate actual loss figure in this case is not possible to assess for the

18  reasons referenced above.  The out-of-pocket loss suggested by the probation officer, roughly

19  $65,000.00 is not unreasonable and the defendant does not quibble with that figure.

20  **C.**    **Intended Loss**

21       The government has submitted a four-page spreadsheet as to its intended loss calculation

22  of $294,779.78, calculated by adding together each of the fraudulent checks deposited in all of

23  the accounts associated wit the Defendant (including accounts not reflected in the Indictment

24  (Attached as Exhibit J).  The problem is that this calculation is not a reliable number which

25  should be accepted by the court.  The pure summation of a group of checks is not a fair guideline

26  threshold given the overall circumstances of this case.  The accounts involved contained "good"

27  money not accounted for under the proposed assessment, questions exist as to the mathematical

28  accounting submitted by Wells Fargo and adopted by the FBI and the United States Attorney, and

1   the defendant is unable to fully investigate and challenge the submitted figure due to the passage

2   of time and the consequential unavailability of records and documentation.  Candidly, the

3   defendant is challenged to present a specific figure to the court to adopt for guideline calculation

4   purposes.  The defendant no doubt benefitted from his illegal conduct and is deserving of offense

5   level assessments, but the court is asked to take into account that his realized profit of 25% of the

6   actual loss was well under $100,000.00, given his relationship with his uncharged schemer,

7   Barbara Wilson.

8                                                           **V.**

9                              **ADJUSTED GUIDELINE OFFENSE LEVEL**

10          Ultimately, this court has to assess this case using the factors set out in 18 U.S.C. § 3553.

11   The Defendant is contesting the guideline offense level calculations regarding "means of

12   identification", obstruction of justice, acceptance of responsibility, and loss calculation.

13   Favorable rulings by the court and the lack of criminal history of the defendant potentially place

14   Mr.  Gilchrist in Zones B or C of the guideline Sentencing Table.  It is submitted that the

15   sentences within that range are what is fair and reasonable in this case, far from the lengthy

16   prison sentences suggested by other parties.

17                                                           **VI.**

18                                    **GROUNDS FOR DEPARTURE**

19          Defendant submits that there is a basis for a guideline departure for Mr. Gilchrist based

20   on the turn around in his life since 2001 and the due process implications of the unreasonable

21   pretrial delay in this case.

22          Prosecutorial pre-Indictment delay can be a constitutional due process violation.  To

23   establish the violation a defendant must meet a substantial burden of showing actual prejudice

24   and that the length of the delay offends fundamental concepts of justice.  There was insufficient

25   evidence in this case to establish that the delay was intentional or reckless or that the government

26   delayed the prosecution in order to gain an advantage.  As a result, Mr. Gilchrist did not move to

27   dismiss the charges against him based on a due process violation.  Nonetheless, the prosecutorial

28   pre-Indictment delay in this case is an absolutely relevant consideration as to the sentencing

1    aspect of Mr. Gilchrist's case a ground for departure.  *See*, *United States v. Martinez,* 97 F.3d 332

2    (9th Cir. 1996).  The defendant has already presented an overview of the timing of the

3    investigation and lack of timely prosecution of this case.  The basic picture is that the case

4    against Mr. Gilchrist sat on the desks of the FBI and the United States Attorney's Office for five

5    years until it was dusted off and Mr. Gilchrist was arrested in late 2006.  Mr.  Gilchrist has been a

6    model citizen since he independently recognized the error of his ways.  The overall

7    circumstances are grounds for a guideline departure, as well as a significant factor for

8    consideration under 18 U.S.C. § 3553.

9                                                           **VII.**

10              **SENTENCING RECOMMENDATION BY THE PROBATION OFFICER**

11                   The probation officer has submitted a fairly negative sentencing summary and

12   recommendation, including references to Mr. Gilchrist being highly devious and the probation

13   officer not being convinced that the fraud which took place over ten years ago was an aberration

14   in his life.  Here, the defendant addresses the various comments by the probation officer and her

15   justification for a 30-month sentence with a maximum period of supervised release.

16                   Fully admitting his culpability and liability for his actions in his statement of the offense,

17   Mr. Gilchrist has explained the role and involvement of long-time Wells Fargo employee Barbara

18   Wilson.  The probation officer dismisses this explanation because "the primary case agent

19   investigated the defendant's claim and determined it was unfounded" and then reiterates the

20   agent's apparent opinion that Mr. Gilchrist's wife had some culpability in the schemes.[2]

21                   Discovery in this case corroborates Barbara Wilson's involvement in the interviewing and

22   hiring of Mr. Gilchrist.  She was then Mr. Gilchrist's immediate supervisor when he worked at

23   the Overdraft Collections Unit at Wells Fargo under the name Michael Colston in the midst of

24   Scheme 1.  Mr. Gilchrist was the person in 1998 who made data changes as to various accounts

25   _____

26         [2]The defendant's assertions as to the involvement of Barbara Wilson is not simply a post-
      plea revelation.  Counsel discussed the information regarding Ms. Wilson while trying to work
27   out a resolution of this case with the government, but it was essentially ignored and rejected.
      Counsel has no idea what investigation was conducted after the information was tendered, other
28   than that Ms. Wilson denied any involvement.

**DEFENDANT'S SENTENCING MEMORANDUM**              21    L:\Bob\Data\RW\Gilchrist\Sentencing Dox\Sentencing Memo 2.dg.wpd

and then made withdrawals of funds over a five-day period.  Of the records that do exist as to the subject accounts, there are anomalous computer inquiries as to the accounts, not attributable to Mr. Gilchrist, but to some other Wells Fargo employee.  The defense issued subpoenas to try and substantiate the involvement of Ms.  Wilson.  However, before record subpoenas to Wells Fargo regarding a personal bank account for "Michael Colston" and other records surrounding that period were not fruitful because too much time has passed, records no longer exist, and the technology has changed.

The same temporal and technological impediments existed as to the defense's attempt to corroborate Ms. Wilson's involvement in the Scheme 2 activities.  Wells Fargo is unable to produce computerized records regarding the various bank accounts involved in Scheme 2 and the available records essentially amount to the bank statements, checks, and simple printouts that were gathered in 2001.  The scheme involved large fraudulent checks that were deposited without holds and then funds were withdrawn days later.  All the subject accounts were Wells Fargo accounts.  Mr. Gilchrist was simply a customer and had no control over holds, but there was never apparently a hold in place when large amounts were withdrawn shortly after the fraudulent deposits.  In response to the recent subpoena request, Wells Fargo's computer systems have changed such that they are unable to produce computer records as to the subject accounts which would show all internal activities regarding these accounts.  These records could potentially have shown information as to holds and internal Wells Fargo reviews or modifications of the accounts.[3]

The information as to Barbara Wilson is provided by the defendant as an explanation, not as an excuse.  The government's dismissal of the information appears to be based simply upon a recent conversation with Ms. Wilson where she denied responsibility.  The information is important to Mr. Gilchrist's sentencing because it is relevant to his relative culpability, the proceeds he actually received from his conduct (25% of the take), and the further temporal due process implications because he is incapable of retrieving potentially helpful information.

---

[3]Such records are available as to the Scheme 1 accounts but only because they were printed out in 1998 and preserved.

1    The case agent's opinion as to the criminal culpability of Mr. Gilchrist's wife, Lisette, is

2    baseless and unfounded.  There is absolutely no direct evidence linking her to the charged

3    schemes.  The only circumstantial evidence is that dated bank photographs show her on a couple

4    of occasions inside or outside a Wells Fargo branch or ATM  with her husband.  She never got

5    involved in any transaction or near him when any transaction specifics were conducted.

6    Furthermore, she had her own accounts at Wells Fargo.

7        The assertion within the PSR that the case agent "also learned" that Lisette Gilchrist "was

8    terminated from her position at UCSF for improper use of customer's personal information" has

9    never been demonstrated or documented to defense counsel.  Beyond that, it is just not true.

10   Lisette Gilchrist worked at the UCSF Cancer Center from 1996 to 2001 as a staff research

11   associate.  She worked in a lab consisting of no more than six research associates and post-

12   doctoral fellows and one principal scientist at any one time, performing bench top cancer

13   genetics research.  In 2001, she went on disability following a repetitive stress injury related to

14   the lab work.  She was not able to return to work after her disability claim was settled and she

15   eventually found employment in a related field.  Lisette Gilchrist's departure from UCSF had

16   nothing to do with the personal information of customers.

17       Relied on by the probation officer is her opinion that Mr. Gilchrist was "evasive" and

18   "unable to keep his lines straight" during his presentence interview.  Counsel was present and

19   disagrees.  Mr. Gilchrist's residential and employment history are a bit convoluted due to his

20   military service, enrollment and attendance at various colleges, and varied employment in the

21   technology/finance field, but counsel disagrees with any characterization of evasiveness.  Perhaps

22   some of the attachments clarify some of those matters.  The insertion by the probation officer in

23   the same paragraph that "Even in his initial pretrial services bail report, he and his wife declined

24   to disclose personal information" is entirely inappropriate.  Not disclosing that information at

25   that state of the proceedings was on the advice of counsel Mark Vermeulen who represented Mr.

26   Gilchrist at the time and was present for the interview.  The ultimate conclusion in the paragraph

27   that the probation officer  "is not convinced that his fraud was an aberration in his life" is a

28   hollow, baseless conclusion.

1

2

3

**VIII.**

**PERSONAL BACKGROUND OF MR. GILCHRIST AND ANALYSIS
PURSUANT TO U.S.C. § 3553(a)**

4

5

6

7

8

9

10

After *United States v. Booker*, 25 S.Ct. 738, 756-57 (2005), the guidelines are no longer binding on the court.  The Supreme Court held that the guidelines are merely "advisory, and that courts are required to consider all of the facts as listed in 18 U.S.C. § 3553(a) in imposing sentence".  *Id.*  Mr. Gilchrist asks this court to approach the sentencing in light of the statutory factors listed in § 3553(a) and the other information that has been provided. The court has discretion to sentence Mr. Gilchrist below the applicable guideline range as long as the sentence is not "unreasonable" in light of the other § 3553(a) factors.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

This court may sentence Mr. Gilchrist outside of the guideline range without establishing that he meets any traditional departure grounds.  The primary directive in § 3553(a) is that the court must impose a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing.  *See*, 18 U.S.C. § 3553(a) Those purposes include the need:  (1) to provide just punishment; (2) to create adequate deterrence; (3) to protect the public; and (4) to provide the defendant necessary treatment and training and medical care.  18 U.S.C. § 3553(a)(2).  Section 3553(a) further directs sentencing courts to consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established for the offense under the Guidelines; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. Thus, the Guidelines range for the offense is but one of ten factors specified under The Sentencing Act.

25

26

27

In accordance with *Booker* and with the directives of 18 U.S.C. § 3553(a), Mr. Gilchrist submits the following concerning the Court's consideration of an appropriate disposition of Mr. Gilchrist's case.

28

1.   **The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Gilchrist.**

In his mid-30's, Mr. Gilchrist went down a path he had never gone down before and engaged in a stupid pattern of fraudulent activity. The schemes he engaged in with Barbara Wilson over a period of years had some clever aspects, but his "fingerprints" were all over the operation and he was the front person. In Scheme 1, his true name was used as a payee on the accounts of others and he personally pulled out money from those accounts. In Scheme 2, it was his picture on the various identifications, he was the one who went into the banks, and he provided his own passport as identification to make a number of withdrawals. He did not "get caught" at the time, and on his own he put an end to the stupidity over making a quick buck and turned his life around. In 2006, the looming cloud descended, Mr. Gilchrist has admitted his guilt, and stands ready to accept his punishment.

The issues of Mr. Gilchrist's self-rehabilitation and the prosecutorial delay in this case are submitted to make for an unusual sentencing determination and balancing by the court. The government is right that this is not a simple bank teller embezzlement, but the government also provides no explanation or justification for sitting on their hands for years. When Mr. Gilchrist turned things around, he did not move away, assume another identity, or try to hide his tracks. He put his feet down, stayed right where he was, and devoted his life to his family and children and making a better life for all of them.

Mr. Gilchrist succeeded in his goal. A volume of materials have been submitted to the court through other probation officers demonstrating Mr. Gilchrist's commitment as a father, his civic and community responsibility, and his solid work history. Particularly telling are the host of photographs submitted. Beyond his employment Mr. Gilchrist has been essentially a full-time athletic coach for his three kids and the kids in the local community, has given his time to civic and charitable organizations, and has been a loyal and supportive husband and parent. Now, it is all at risk and he knows it. The defendant is not asking for any "cancelling out of his culpability", but it is submitted that under the circumstances, he is not deserving of a prison sentence.

2.     **The Need for the Sentence Imposed to Satisfy Certain Articulated Purposes**

    **a**.     **To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**.

The offense conduct here is serious and deserving of punishment.  Having served in the United States Navy, possessing a significant educational background, and having no criminal background or history, Mr. Gilchrist knew better.  The other side of that coin is that he figured that out on his own and did something about it.

The concept of promoting respect for the law has an unusual application in this case.  Society wants people to respect the law and stay on a productive path.  Mr. Gilchrist returned to that path in 2001 on his own without government intervention.  The government also has a responsibility to provide respect for the law and has its own obligations of fairness, diligence, and reasonableness.  Waiting five years to prosecute someone when that person has clearly curtailed all criminal activity and has been a productive member of society does not promote respect for the law.  It would be an entirely different situation if criminal conduct had continued during the lag time, but that is not the case here.

    **b**.     **To Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of Mr. Gilchrist.**

Mr. Gilchrist clearly poses no current threat to the general public and he has seen his own light in terms of deterring himself from further criminal conduct.  The government's argument as to a societal deterrence under this particular category is bizarre.  Their argument is that a significant custodial sentence is justified to deter potential white collar criminals from believing that people who "only" steal from banks (as opposed to stealing from individuals) often get no more than a slap on the wrist.  How does that argument comport  with waiting five years to prosecute Mr. Gilchrist?  A reasonable concept of deterrence is to prosecute cases in a timely manner in order to discourage criminality.  The appropriate societal message in this case is that the government should be deterred from sitting on their hands in these types of cases and should  act fairly and responsibly.  There is submitted to be no significant societal message delivered by sending Mr. Gilchrist to prison.

   **c.**  **To Provide Mr. Gilchrist with Needed Educational and Vocational Training, Medical Care, and Correctional Treatment.**

   Mr. Gilchrist is now unemployed and his family needs him.  He is now close to 50 years old and there is not going to be any educational or vocational training in a prison setting  that will help him.  Mr. Gilchrist has a host of medical problems and there is a legitimate concern as to continuing and appropriate medical treatment.  Electronic monitoring and/or community confinement will allow Mr. Gilchrist to seek and maintain employment, continue his devoted relationship with his family, and will serve any necessary societal needs.

  **3.**  **The Kinds of Sentences Available and Defendant's Sentencing Recommendation**.

   Given the array of sentencing factors involved in this case, this court has wide discretion in its sentencing determination.  With the lack of criminal history and the overall circumstances of this case, defendant submits that a probationary sentence without custodial prison time and a minimum period of supervised release is a just and appropriate sentence.

**CONCLUSION**

  For the foregoing reasons, defendant request this court impose sentence in this case in light of the factual material, historical information, comments, and requests set out in this memorandum.

Dated: May 26, 2009      Respectfully submitted,


                _____/S/_____

                ROBERT WAGGENER
                Attorney for Defendant
                DWIGHT GILCHRIST